Good morning, Your Honors. Joel Pfeffer for the Plaintiff's Appellants. May it please the Court. The first issue on this appeal is whether it is misleading to repeatedly state that Thane's stock has been approved for quotation and trading on the NASDAQ National Market System, quote, upon completion of, end quote, Thane's merger with Reliant, and that such listing would provide greater liquidity, when the defendants already decided not to list, quote, upon completion, unquote, of the Thane Reliant merger. Now, how could it not be misleading? The heart of our securities regulatory system is disclosure. Here, although defendants knew that Thane's stock would be relegated to trading on the over-the-counter bulletin board upon completion of the merger, the prospectus was absolutely silent as to any possible trading venue for Thane's stock other than the National Market System. I can't think of any lessons. On the paragraph that says Thane Common Stock to be issued in connection with the merger has been approved for quotation and trading, what does that phrase approved for quotation and trading mean? And let me just tell you what my concern is, and that is, does the phrase approved for quotation and trading mean it's been qualified, that is, that it satisfies some standard by which we would judge things that would go on the NASDAQ, or does it mean NASDAQ has accepted it and we intend to list it there? Your argument is the latter. Yes. But why the sort of strange way it's phrased, approved for quotation? Yeah. I think that's the problem that the district court had, who I might say, Judge Selna is one of the finest judges I have appeared before, present company accepted. Well, I used to work for Judge Selna when he was plain old Jim Selna at Melbourne & Myers, so I was an associate. Everybody on the plaintiff's side was tremendously impressed with him. His fairness is courtesy of the whole nine yards. This was Judge Selna's problem. You cannot, a stock cannot be approved, cannot be traded until the deal is complete in this case, because Thane was not a public company. Thane stock could only be approved for trading after the deal was finished, because Reliant was a public company and Thane, in effect, was going public through the back door. I think that's what Judge Selna did not understand. There never could have been. He focused on that one paragraph in the original filing that was a summary of the covenant in the merger agreement that Thane would use commercially reasonable efforts to cause its stock to be traded on the national market system immediately after the merger. And that sentence said it's a condition to the merger that Thane stock be listed. I think that's what confused the district court. Thane stock could only be listed after the merger subject to the $5 bid requirement, which everybody could see was met. The defendants didn't pay the filing fee, because they had decided not to list, and the company never went on the national market system.  Well, the rest is history. As soon as the stock goes public, the price goes up. Right. How could it be material? The price was meaningless according to the efficient market hypothesis, according to Cama, according to the Fifth Circuit in Unger, according to the First Circuit in Polymedica, according to this circuit. You mean if the minute the stock went public, the price just took a nosedive? That would be irrelevant? You have to have an efficient market. You have to have some mechanism to characterize events, facts into price. I could have rigged with $50,000, any of us could have rigged the price of the stock. That's the essence of Cama. The Supreme Court in Basic against Levinson in 1988 decided that, you know, permitted the fraud on the market approach to avoid reliance, having to prove individual issues of reliance. Exactly. So fraud on the market and looking at the price effects really is meant to measure reliance under N10B5 actions. And you have to prove reliance in N10B5 actions. Right. But this is a Section 12 action, and you don't have to prove reliance. We don't have to prove reliance. So why would the price be relevant at all, regardless whether the market is efficient? What difference does the price make when what you're supposed to be focusing on is the objective standard of what would have affected a reasonable investor's decision to either take the same stock or sell his reliance stock? It's not the same as a N10B5 case where you're talking about someone who could buy one stock or 100 stocks, and, you know, they're going to look at the market and there's going to be something, they're going to rely on statements. You have one decision when there's a merger. Right? You can sell or you can take the stock. Right. What you would do is the decision before the reliant stockholder, Your Honor, was whether to sell into the market or take the stock. Right. So what we're supposed to be looking at is assuming the statement's false, which I think is somewhat of a close question, assuming it's false, whether that statement would have affected a reasonable investor's decision to sell or hold. Right. So why would the price have any relevance at all? Well, the argument is, first, to be fair, materiality and reliance are not completely different concepts. There's a tremendous amount of overlap. But that is how the fraud on the market theory has developed. Right. Well, except that CAMA, well, it's developed in the context of reliance and 10B5 cases. Right. Although materiality is really a related thing. I think viscerally, how could you not think it's material? I mean, institutions won't buy bulletin board stocks as a rule. Well, yeah, right. Well, I understand all of those arguments. Right. Of course. I mean, you can't look it up in the Wall Street Journal. Right. But I'm just saying, I mean, aren't we supposed to be looking at the point in time when the reasonable investor is making his decision? So why would we look at what happened later? Well, I think that's correct. But Judge Selna disagrees. No, but he also said there's no authority, and I'm the first judge to ever find this in the country. Yeah. It's a little aggressive, I thought. But I could understand where he was coming from. He was coming from 10B5 cases. Right. And if in fact, you know, his point was that if the market price did not react, then that's evidence of materiality. Your point, I think, is well taken, that you don't look at post hoc developments. Even if it goes down? Even if the stock were to go down? No. 12A2, by the way, is not the most — the stock price has nothing — well, if the stock went down and wasn't an efficient market, it would be the same thing. It wouldn't matter. The price just doesn't matter. Is it possible, Mr. Pfeffer, that if you had been listed on the NASDAQ, that the stock would have done worse than it did? Anything's possible, but it's not likely. There's — you know, listing on NASDAQ immediately after a deal is not an academic thing. Listing on — well, it's not technically NASDAQ. It's the national market system. Listing on the national market system is like being accepted into a prestigious school. What's the difference between trading penny stock versus trading blue chip stock, in a way? Well, there are — it doesn't necessarily, you know, matter what the venue is, really. But these — people avoid penny stocks. People avoid the bulletin board, and for good reason, because historically there's been a lot of fraud there. But it's like being on a national market system or going in is like going to a prestigious college. It may be difficult to get into, but it's extremely — much more difficult to get thrown out of. With the national market system, to get into, you need a $5 bid. To stay on, all you need is a $1 bid. So by not going in and not telling anybody why you're not listed on the — on the national market system, they created this confusion in the market. The price ultimately — this stock went down by 96 percent in seven months, unless I missed a depression or this company filed bankruptcy. There's no reason for that, other than investors were just, you know, reacting negatively to a company. That's why I'm puzzled when you say the price is irrelevant. I mean, we could decide your case, but we're also making precedent for other cases. Are we going to tell investors if you — you know, the minute the stock goes on the market and the price goes down, that's not evidence you can introduce that's irrelevant, according to Mr. Pfeffer? No. Well, according to the First Circuit in Polymedica — Is that the rule we — is that the rule we should adopt? You should adopt — the rule that you should adopt is the same rule in the Fifth Circuit and the First Circuit and other — the Fourth Circuit and the — and this circuit in Binda, that unless you first find that the stock trades on a — on an efficient market, the price is irrelevant for any kind of consideration of either reliance in 10b-5 cases or materiality. Okay. And the Judge Salinas says maybe it's not a one-for-one — it doesn't follow exactly a one-to-one pattern, but, you know, after — after a certain period of time, we can — we can discern something about what the market did. Is that — was he wrong about that? That's inconsistent with every decision so far. Every decision says you first find whether the company — whether the market — whether the market has sufficient characteristics to translate events into price. The — But isn't that evident here, the fact that by August, you — that Thain is reporting a decrease in earnings and its — and its stock just tanks? Doesn't that — doesn't that suggest that the market was perfectly capable of adjusting, even though it was being traded on the OTC market? No. Not at all. It just — what it probably — You mean those are not connected events? Thain was not 96 percent less valuable seven months later. Thain was the same company. It was making money. What the plunge in stock price was is that, even as defendants' experts said, you don't want to buy stock where you think — in a company where you think management is dishonest. And investors had every reason here to believe that management lacked candor. There's not a word in the prospectus of where this company is going to trade except on the national market system. I mean, the purpose of a prospectus is to inform investors, tell them where the stock is going to trade, not tell them where the stock is not going to trade. Then, to compound matters, for some — I think about 12 weeks after the offering, they don't say a word about why the stock is not trading in the — they don't say a word publicly about where the stock — why the stock is not trading on the national market system. And then they answer apparently investor calls, the two plaintiffs called, and they spoke to either the CFO in one case and the outside counsel in another, and they were told, don't worry, something big is going to happen. When Thane finally publicly discloses or gives some reason for why it's not trading on the national market system, they dissemble. They say they decided in May and June not to list, when in fact the record is clear that the pivotal meeting was in April. And the reason they put May and June is because they didn't want to publicly admit that they had — that they knew they weren't listing on the national market system before reliant shareholders voted. The data to vote is the key on Section 12A2. I think on the issue of materiality where the district court went wrong is they accepted the defendant's expert's theory that some of the information, that the market was capable of absorbing some information. The law is clear, and starting with Eugene Fama, who developed the efficient market hypothesis, that the market has to be able to — the company has — the market has to absorb all information, not some information. And for that, I think it's footnote 25 in the Kammer case describes that. And the First Circuit in Polymedia describes that. And that's — Polymedia was the — Medica was the first decision reported in the relevant volume, and I believe it's on page 10 of that volume. If the Court does not have any other questions, I'd like to reserve for rebuttal.  Sure. Okay. Thank you. Thank you. The relationship of 10b-5 to — to Section — Senate 7A12. And where would you go on the question of loss causation?  If this Court finds that these prices satisfy the efficient market or are relevant, I'm going to lose on materiality, most likely. If it finds, as it — if it finds consistent with all the other circuits that it's not — that these prices are not relevant, then there's no way that defendants could ever meet their very heavy burden of establishing negative causation. Thank you. If you don't remember, the defendants' expert himself in the panel, not long before he testified in this case, told the Delaware Supreme Court — the Delaware Chancery Court that it could completely ignore the $3.70 price of a company's stock trading on the New York Stock Exchange and find it reasonable to pay $17.75 — $17.75 for that same $3.70 stock or 480 percent higher. So, you know, the defendants' — there's another case. That wasn't — you know, there's another case where at least defendants' expert argued that market price should be completely ignored. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Daniel Tycote. I'm counsel for the defendants, Thane International, William F. Hay, Denise DuBarry Hay, Kevin McKeon, and Mark Taylor. With me at counsel table is my partner, Mr. Michael Tu. This case comes to the Court for review following a careful and considered opinion by the district court judge, Judge Selma, who conducted a bench trial that made effective and efficient use of direct testimony, testimony by way of declaration, the cross-examination of both recipient and expert witnesses, and extensive examination of the witnesses by the trial judge himself. The opinion should be affirmed for the following three reasons. First, there was no misstatement or omission. Second, assuming there was a misstatement or omission, it was not material. Third, in any event, defendant's loss causation defense was established by unrebutted evidence, and the judgment should be affirmed on that ground, notwithstanding the fact that the district court judge did not find it necessary to meet it. Going to the first point, there was no misstatement or omission. The district court judge considered all the evidence, reviewed all the documentary evidence, and reviewed the testimony of the witnesses, both by way of declaration and their cross-examination. And he reached the following reasonable conclusions. First, that there were only two statements that were made, that Thame would use, quote, commercially reasonable efforts to cause its shares to be qualified and approved for quotation of the national market system or a national exchange. And the judge found the clearest expression of that in the merger agreement section 6b of that, 6.5b. Second, Thame stated numerous times in the prospectus that it hadn't been. Let me stop you there. Yes. That paragraph says Thame shall use commercially reasonable efforts to cause its outstanding immediately after the merger to be approved for quotation on the NASDAQ. And then later in that same paragraph says it's promptly as practicable. Now, the same question I put to Mr. Pfeffer, that phrase, approved for quotation, means what? That we wish to be qualified, but in fact we're not going to list it? Is that all Thame had to do? Yes. Was just have its stock valued at $5 and do everything but refuse to pay whatever the $100 filing fee or whatever it takes to be listed on the NASDAQ? Literally, that's all that was required. And so you have a literally true statement there. Now, I know what's behind the question. The behind the question is, you know, was there some sort of was this a bait-and-switch kind of attack? Were they Is this the equivalent of saying that all of our attorneys are qualified to take the bar in California, but it stops short of suggesting that anybody has actually taken the bar? There, you know, that's one possible analogy you might draw. It almost seems like a little bit of a sharp, sharp dealing to say we're going to be qualified to be listed on the NASDAQ, but we're just fooling you. We have no intention of actually listing ourselves on the NASDAQ. Right. So you have two cross-currents going on here. One is, is that if you look at the black-letter law of Section 1282, the black-letter law says that we don't look at the motivation of the parties. We don't look there. We look at the literal true statements. If you look at what actually, what the case law actually does, the case law actually, if you take a look at the McMahon case, if you take a look at the Blasdell v. Mullinex case, if you take a look at this Court's Kaplan case, they do look behind the curtain to see, is there something going on here? Is this a ruse? You know, the Blasdell case is just a pure, plain old fraud. There's nothing complicated about it. The plaintiff is being told that he's buying $10 stock that's going to trade on the New York Stock Exchange. The guy who sold it to him actually got it for a dollar, and the company is actually in bankruptcy or about to go into bankruptcy. It's pretty clear from the underlying evidence that at one point, Thain had every intention of being listed on the NASDAQ. What was in question at Thain was the timing of the listing on the NASDAQ, and that at some point in April or May that you had these investment advisors who said, well, why don't we wait till this second event occurs, and then we'll go and list on the NASDAQ. By the time the second event occurs, the stock is below $5, and Thain, in fact, is not qualified to go on the NASDAQ. So it looks like through the entire period that we've complained to, which is June and July, that Thain had every intention of listing itself on the NASDAQ as soon as this second event occurred. That's exactly correct. And then it was no longer qualified to do so. That's right. But it did not list itself on the NASDAQ immediately after the merger when it was qualified to do so. That is exactly right. Why isn't that a misstatement of fact for somebody reading this? Well, because of a couple of reasons. One is, as you point out, the case that was tried to the district court, the plaintiff's case was that Thain had to list immediately. That was the case that was tried. That was what their experts said. That was what the witnesses said. That's what your paragraph says. But it doesn't say that we will list on the NMS immediately. It says, this paragraph says that we'll be qualified for list, that we will immediately be approved for quotation on the NASDAQ National Market System. Immediately after. We used commercially reasonable efforts to cause the outstanding stock immediately after the merger to be approved for quotation. That's probably as practical. Exactly right. Well, we were approved for quotation before the merger. So that condition was fulfilled. What you're asking is actually a different question. You're saying, does this mean not just that you have to be approved for quotation, but that immediately after the merger, you have to list? Is this stock language that's approved for quotation? Is that standard language, approved for quotation? Does that have some kind of commercial meaning? In the verified stock world, does approved for quotation have? Is that sort of a term of art? Well, I don't know if it's. What is it supposed to mean to a lay reader? I don't know. I am a lay reader in this area. Right, right. I don't know if it reaches the equivalent of a term of art. There are various requirements that need to be done in order to satisfy the NASDAQ requirements. And as set forth at the trial and as set forth in our brief, FAME did all those things. So what this, I think what, you know, a reasonable person reading this, and I guess the other, you know, big takeaway on this is that, you know, we had a trial here. We had the district court sitting as the trier of fact who, you know, if I were coming up to you on a 12b-6 motion, I think that you would be, you know, reasonably saying, well, couldn't somebody have interpreted this differently? But we had a trial here where some judge sitting as the trier of fact heard all the evidence, listened to all the witnesses, and concluded reasonably that this wasn't a promise that we were going to list. This was an accurate statement of fact that we had satisfied all the requirements for listing, and the judge also heard the evidence that said that everyone at FAME intended to list this doc. This wasn't a bait-and-switch on the part of FAME at all. This was FAME being advised by sophisticated parties, saying that your best bet for yourself and your shareholders is to wait five or six weeks, do it in this other fashion, and it will benefit everybody here. Well, you have a small company that is listening to the investment bankers, that is trying to do the best thing, that they're self-interested for themselves and for their shareholders. What if FAME had just sort of dealt the stock out of garage sales on Saturdays, instead of even listing it on the OTC? Would that have been a material misrepresentation? A little sign in front of the thing says we're trading FAME stock here on Saturday mornings at our garage sale. The sign says, qualified to be listed on the NASDAQ. I think you could work it to a point of absurdity where you would say that there was a misrepresentation. If what you had was a company that didn't have any intention at all to list, if that was its intention, it was just going to do garage sales or, you know, rule. But your argument is that this was approved for qualification, approved for quotation. And if it's approved for quotation, then it can be sold at the garage sales on Saturday mornings. Well, maybe that's then the case. But I think that one of the things you have to do with this is not make the case harder than the case that was actually tried to the district court and what the plaintiffs actually tried as their theory of the case. Their theory of the case was that we had to list it immediately. And the evidence that the district court accepted was that, one, that word immediately wasn't used. We never said we were going to list it immediately. And, second, the court took the plaintiff's expert who testified that the first version of the prospectus that was out in the market said it was a condition of the merger that we were going to list on the national market system. I don't quite understand even the relevance of that. Is it your view that an investor has to look up past copies of the prospectus to see if he can discern differences? Have to do, like, a legislative history search? Well, the relevance of that is that it was the plaintiff's expert. It was the plaintiff's expert that said the market was paying attention to the difference between that first version of the prospectus that said it was a condition of the merger and the third amended version which deleted that condition. Candace Preston, the plaintiff's expert, testified that the market paid attention to that, that it regarded that as important, and that it understood its import. What she then said, and this is, again, the district court judge hearing testimony, evaluating credibility, what she then said is that the deletion of that condition made it more likely that Thame was going to list on the national market system. And Judge Selma, in his opinion, rejected that as being not an exercise in logic. Well, he actually turned it around and found the other way. Correct. But what was actually sent to the reliant shareholders? The version that was sent to the reliant shareholders simply had the statement on the cover that said the shares of Thame common stock to be received by stockholders of reliance in connection with the merger have been approved for quotation and trading on the NASDAQ national market system upon completion of the merger subject to Thame's compliance with the minimum bid requirements of $5 per share. Okay. And that's something you do under regulation SK? Yes. Right. And so they received that, and then all the other. Did they receive the questions and answers? Yes, the prospectus that had, you know, what are the benefits of the merger. And they talked about the benefits of Thame listing on the NASDAQ. And don't we look at the thing as a whole? We look at all the statements? We don't just pick out that one line that you just said? That's correct. Okay. Because that's what the reasonable investor got. That's what they would have read in making their decision. Right. I agree. And that's why, you know, again, there is mention that we had a trial here. We had the court sitting. On this issue, I mean, I think it's a close question, okay? But on this issue, you didn't really need anything other than looking at the prospectus to make a decision about whether or not. Well, so. And the fact that it wasn't listed. Well, you needed a trial on this grounds. In the abstract, you could have taken this to an appellate court and said you can read the prospectus equally well as anybody else and make your own decision. Recall that the plaintiffs didn't try a case that was based upon just these words in the prospectus. The plaintiffs tried a case where what Thame had to do was to list immediately. And the plaintiffs faced a dilemma here. And the dilemma was if you acknowledge that Thame has any discretion at all, wait a day. Wait two days. If it's, you know, Black Friday and all the investment bankers in the world tell you you're nuts if you go out and you list today. According to the case that was tried, Thame still had to go out and list even though everybody was telling them that it was foolish to do so. That's an extraordinary circumstance. I mean, that's, I mean, right? Black Friday would be an extraordinary circumstance which might excuse a commitment. But that was. I mean, not say that the commitment was false. But it might, I mean, was, right. It would excuse compliance with a commitment as opposed to having not made the commitment. But that wasn't the case that was tried. The plaintiff's expert was asked specifically if it could be proved beyond any reasonable doubt that Thame would benefit from waiting a few weeks, would that still have been a misrepresentation in the perspectives? Because in your view, they had to list immediately. She said yes. So the case that was tried was that this management, despite the fact that it doesn't say anything about we will immediately list. It doesn't say we will list. But the case that was tried was that you had to immediately list after the merger. You couldn't wait and listen to the advice of learned professionals and try to do the thing that was best for your shareholders. Well, you had shares. I mean, they were supposed to, they should be, they were going to be listed somewhere. And everything said they would be listed on the NASDAQ or NMS. And instead they were listed on, what was it, OTC? OTC holding board. Right. I mean, that was never mentioned. They were listed somewhere. It was never mentioned that they were going to be listed other than on NMS. And so that Thame, well, it was clear that the company that was starting would be listed on the OTC BB at least because Reliant was trading on the OTC BB. Thame was merging into Reliant. You were at least going to be there, and then you had to do something affirmative to get onto the NMS. And you did that. You got approved. We got approved, but we delayed the final step of the process. We got approved. So that was literally true. We just didn't take the last step of listing on the NMS because of the factors that I've gone through. They were advised and they listened to the advice. I wonder if you mentioned the materiality part of this. I'd like to. Thank you, Your Honor. On materiality, I think that the district court judge looked at three things. He looked at what does the economic literature say about the benefits of listing on the OTC versus the NMS? What did the empirical evidence show in this case about Thame, its ability to react in price, its ability to impound information to its price? And then it also looked at what actually happened in this case. What did people actually do? What do you think of the question posed to Mr. Pfeffer that price is irrelevant? When we look at whether it goes up or whether it goes down, we just look at what would have been material to a reasonable investor at the time. A couple points. One is just looking at materiality and the TSC industries. Recall that the TSC industry says that the emitted or misstated fact has to have a quote, substantial likelihood. So it's not any likelihood. It's not maybe somebody could have a different decision. It's a substantial likelihood. And we had a district court judge sitting as a trier fact that made a determination that there was not a substantial likelihood. On the specific question about price, one question is how can price be irrelevant if it's the basis for asserting millions of dollars of damages against my clients? It's clearly relevant. What Mr. Pfeffer is asking this Court to do is really sort of the opposite of what was happening with Basic and Kammerer. If you look at Basic and Kammerer and you look at what's really going on in those cases, what's going on is courts are using the science of economics and applying it in the best way they know how to getting the correct legal results, and it respects the science of economics as much as it respects the science of physics. You use the materials that are out there and you apply it and try to get just and fair results. All the cases that are cited, the plaintiff's site in Polymedica, this Court's opinions in Basic as well, deal with the context of the efficient market theory for a fraud on the market case. And it's in that context that we're looking for this perfect efficiency. That wasn't the question confronting this district court judge. The question confronting this district court judge was could we be reasonably confident that within the first 19 days of trading, when the stock traded above its merger price, that the market had absorbed the fact of where it was trading and could make a reasonable conclusion that that information had been impounded into the stock price such that we could reach a reasonable conclusion that even if there was a misrepresentation here, it was not material. And with all due respect to Mr. Pfeffer, he's got it wrong on Eugene Fama and the economics of this case. If you look at the Sharpe quote that we have from his book Investments, and Sharpe is a Nobel Prize winner in economics, Sharpe gives the efficient market theory talks about information sets and the way information gets impounded and the efficiency is can you make supernormal profits based upon an inefficiency in the market based upon an information set not being absorbed by the market? Well, that was never going to be possible here. We are talking about the most open and obvious fact possible, namely where does the stock trade? Nobody could make a supernormal profit based upon where a thing was traded. That information was absorbed into the marketplace virtually immediately. And, again, we have to look at the case that we actually have here. We don't have a close case here. If we were coming at upon appeal and we were saying, well, gee, on the first day it was above the merger price, and then it must have been impounded immediately there, and then, you know, then it came down, ignore all that, we might have a very different case. We don't have that situation. We have 19 days where it's above the merger price. We have only 4 percent of the shareholders selling during that period. We have 27 percent of the shareholders, including the two main plaintiffs in this case, waiting until the very, very end. We have the economic literature that's discussed in our briefs, including the plaintiffs' literature, that shows that trading on the NMS versus the OTCBB is really not such a big deal. It's something that produces minimal price effects, if any. Candace Preston's literature that she relied upon actually says that 60 percent of the time there was a beneficial effect, a modest beneficial effect of less than 1 percent. 40 percent of the time it went the other way. It's not clear what – whether you would get any benefit at all here. But the plaintiffs offered the district court judge nothing to go on in terms of assessing materiality other than really an Ipsy-Dixit assertion that it was material. Roberts. I see you've used up your time. I wonder if there are any other questions. One question. Aren't we bound to follow the Binder case? Well, Binder versus – the short answer is no. Binder required an efficient market for purposes of considering the price effects. Of a fraud on the – under a fraud on the market theory. Right. But isn't that what Judge Selna incorporated into this analysis? No. I don't believe so. I mean, Binder, first off, talks – on the cameras criteria, Binder actually is dicta. But it requires an efficient market before you consider the price effects. And it applies the – what is it? The five factors or four factors from? Binder in dicta speaks approvingly of the camera factors. But I would urge you to look at the America West case. We've just decided a decision that says unbonked, that says nothing we put in a decision is dicta. If it's necessary to be – if it's necessary to talk about it, it's finance. I apologize. I wasn't aware of that. But I would urge you to look at the America West case for actually a more instructive application to this case where America West cites basic and says basic doesn't say that And what's required here is the court to conduct a fact-specific inquiry in each case. And that's really what Judge Selna did here. Judge Selna did conduct a fact-specific inquiry. The other question to ask yourselves is, okay, if we say prices – if NYSERDA is going to come out and say the prices are irrelevant, well, then where do you go with that? And do you assess, you know, in this case, you know, will you – to the standard that's expressed, right? If you look at what the reasonable investor – what would influence the reasonable investor at the time that he makes the decision. You look at – the criteria is, was there a substantial likelihood – that's the criteria, that's TSC – that the omitted or misstated information would have caused the investor to make another decision. And the point to be made is that Convergent and, I believe, Binder, Kaplan, McMahon, all those cases are really summary judgment cases or motion-to-dismiss cases, but primarily summary judgment cases where the courts are saying, look, a – it's possible that the trier of fact could reach a different conclusion here. We're not coming up on appeal on a motion-to-dismiss or a summary judgment case. We're coming up after a district court judge did a diligent, thorough job, followed the criteria of America West, and – and did what was necessary to make a determination as to whether this information, even if it was a misstatement, was material. And I think that this Court, under the Standards Guiding Appellate Review, would have to conclude that that was a reasonable decision under the facts in there. It's America West Ninth Circuit. Yes, it is, Your Honor. Okay. Its employees – would you like to cite? No, that's okay. Thank you, Your Honor. Mr. Feffer. Thank you, Your Honor. Aside from the fact that we were both before the same diligent and conscientious judge, I must have been at a different trial. There are no facts here in dispute. Every issue that I've raised comes from the background facts cited by Judge Selner in his opinion, which in turn come from the stipulated pretrial order facts. The defendant's intention and their motives, we don't question that. They may have been trying to do the right thing, but it's totally irrelevant to our claim. We wanted disclosure. There was no reason why they couldn't tell us. Let us make the decision. Why did they inform reliance inside stockholders? And they even got a waiver from them. Why not the public stockholders also? Why are the public stockholders always left holding the bag? The defendants characterized the waiver as belts and suspenders. Belts and suspenders would have been a written acknowledgment that the condition was met. Not a waiver of the condition. Waiving the condition is amending the merger agreement. But it looks like if the you can say let the stockholders make the decision, but the stockholders would have known immediately that the condition had not been satisfied. They were not listing it on the NASDAQ, that it was only being listed on the OTCBB, and the price had gone up. Now, if they felt misled about that and felt like that was a disadvantage, that would have been a really good time to sell. It would have, except that there's more than sufficient evidence in this record that when shareholders called up the company to find out what was happening, they were told, don't worry, we have an exciting announcement coming down. But an exciting announcement could be a lot of things. I mean, that may be some other kind of misrepresentation. But I can imagine other things that might have happened. You know, Intel is about to buy us. You know, good news. Gershengorn No. That's probably what the who knows what people are thinking. But that's not two violations of the securities law doesn't make an accurate prospectus. They should have put in where they were going to trade. You don't put in where you're not going to trade. You put in where you're going to trade. I mean, this is very fundamental. And their motive and their intention, who cares what it is? I mean, this is purely a disclosure case. We want disclosure. We're entitled to disclosure. Defendants ask, how could price be irrelevant if it is the basis of damage? Well, the damages in this, in Section 1282 are purely formulaic. You just get your money back. You get what you lost. There's nothing punitive about it. Roberts. As of what time? You get, well, you have to value the stock of Reliant that you traded for the, for the Thane. And it was, there's general agreements, roughly $7 a share. Then you would get, you would subtract from that $7 a share whatever the people they gave up $7 a share, and the question is what they got back. If they sold it on the market for $8.50, they have no damages. And would you value it as of the day of the merger? Yes. So they would. So it's about $7. And if you. Didn't it go up a buck and a half that day, or? Well, the reported price went up, but who knows what that means. You value it on the day of the merger. The consideration that Reliant shareholders were surrendering was the value of Reliant stock at that time. And then if they held it to, to the buyout at $0.35 a share, which was very generous, they would have $6.55 roughly in damages. If they sold it for $7, they'd have no damage. If they sold it for $5, they'd have two damages. That's the way it is. It's very simple, 12a2. There's nothing punitive about it. That's it. I'm over my time. Thank you. Thank you. Thanks, both. That was an interesting argument. The case just started. 0556190 and 0656,000 United States versus New Century Mortgage. The con portion of this case has been submitted on the brief, so we'll hear argument on the New Century Mortgage Appeal.
judges: Silverman, Wardlaw, Bybee